**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILLIS ENGINE STRUCTURED TRUST V, WILLIS LEASE FINANCE CORPORATION, BANK OF UTAH, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS OWNER TRUSTEE FOR WILLIS ENGINE STRUCTURED TRUST V, AND WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS OWNER TRUSTEE FOR WILLIS ENGINE STRUCTURED TRUST V, <br><br> Plaintiffs, <br><br> v. <br><br> PAKISTAN INTERNATIONAL AIRLINES CORPORATION LIMITED, <br><br> Defendant. | Case No: <br><br> **COMPLAINT** |

Plaintiffs (i) Willis Lease Finance Corporation ("WLFC"); (ii) Willis Engine Structured Trust V ("WEST"), a securitization vehicle serviced and owned by WLFC; (iii) Bank of Utah ("Bank of Utah"), not in its individual capacity but solely as owner trustee for WEST; and (iv) Wells Fargo Trust Company, National Association ("Wells Fargo"), not in its individual capacity but solely as owner trustee for WEST (together with Bank of Utah, "Lessors," and collectively with Bank of Utah, WEST and WLFC, "Plaintiffs"), by their undersigned attorneys, as and for their Complaint against defendant Pakistan International Airlines Corporation Limited ("PIA" or "Lessee"), allege as follows:

## NATURE OF THE ACTION

1.     This action arises out of PIA's breach of four multi-million dollar aircraft engine leases, under which Lessors agreed to lease four CFM International aircraft engines (the "Engines") to PIA in exchange for, among other things, PIA's agreement to timely pay rent and

certain "use fees" based on PIA's monthly utilization of the Engines, among other amounts; maintain the Engines in accordance with regulatory and contractual requirements; and, upon expiration of the lease terms, redeliver the Engines in accordance with the conditions set forth in the leases.

2.      In breach of these obligations, PIA has ceased making monthly payments as required under the leases, failed to maintain the Engines, and returned two of the Engines in a redelivery condition that is not in compliance with the leases.

3.      PIA's breaches have been continuing for almost a year.  PIA, moreover, has failed to respond to *six* separate default notices, and continues to operate two of the four Engines, notwithstanding WLFC's demands to return such Engines forthwith, all in breach of PIA's lease obligations.  Accordingly, Plaintiffs are commencing this action to recover damages in an amount to be determined at trial, but in excess of $2.5 million, and to take immediate repossession of the two remaining unreturned Engines.

## JURISDICTION AND VENUE

4.      This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over Plaintiffs' ninth cause of action for return of aircraft.

5.      This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the first through eighth state law causes of action—for breaches of leases—because these claims arise out of the same nucleus of operative fact as Plaintiffs' federal question claim.

6.      This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as the amount in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs, and is between citizens of Utah, Delaware, and Florida, on the one hand, and a citizen of a foreign state, on the other.

7.    The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1330(a) because:  (i) the action is against PIA; (ii) the Pakistan government has a majority ownership interest in PIA; and therefore (iii) PIA is an agency or instrumentality of a foreign state within the meaning of 28 U.S.C. 1603(a) and (b).  PIA is not entitled to sovereign immunity in this action, including pursuant to:  (i) 28 U.S.C. § 1605(a)(1), because PIA contractually waived any right to sovereign immunity; and (ii) 28 U.S.C. § 1605(a)(2), because the action is based on PIA's extraterritorial commercial activity, which activity caused a direct effect in the United States.

8.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(3) because PIA is subject to this Court's personal jurisdiction.

## THE PARTIES

9.    WEST is a statutory trust organized under the laws of Delaware.

10.    WLFC is a corporation organized under the laws of Delaware, with a principal place of business at Coconut Creek, Florida.  WLFC is a leading international aircraft engine leasing company and is the contractual servicer of the Leases (as defined below) in respect of the Engines on behalf of WEST, Bank of Utah, and Wells Fargo.  WLFC is the beneficial owner of WEST, which is, in turn, the beneficial owner of the Engines held by the Bank of Utah and Wells Fargo.

11.    Bank of Utah is a state-chartered commercial bank, with a principal place of business at Ogden, Utah.  Bank of Utah is acting solely in its capacity as trustee for WEST and not in its individual capacity.

12.    Wells Fargo Trust Company, National Association, is a national banking association, with a principal place of business at Salt Lake City, Utah.  Wells Fargo is acting solely in its capacity as trustee for WEST and not in its individual capacity.

3

13.     PIA is a corporation organized under the laws of Pakistan, with a principal place of business at PIA Head Office Building, Jinnah International Airport, Karachi, 75200, Pakistan.

14.     PIA is engaged in the commercial activity of travel selling services to customers around the globe.  According to its website, "PIA's vision is to be a world class profitable airline meeting customer expectation through excellent services, on-time performance, innovative products and absolute safety."  *See* www.piac.com.pk/corporate/about-us/company-profile (last visited June 7, 2023).

## FACTUAL BACKGROUND

### I.     The Lease Agreements

15.     On or about May 12, 2021, Bank of Utah and PIA entered into a Lease Agreement ("Lease 697519").  Under Lease 697519, Bank of Utah agreed, for the benefit of WEST, to lease to PIA a CFM56-5B engine bearing engine serial number 697519 ("Engine 697519").[1]  A true and correct copy of Lease 697519 is attached hereto as Exhibit 1.

16.     On or about May 12, 2021, Bank of Utah and PIA entered into a Lease Agreement ("Lease 575195").  Under Lease 575195, Bank of Utah agreed, for the benefit of WEST, to lease to PIA a CFM56-5B engine bearing engine serial number 575195 ("Engine 575195").  A true and correct copy of Lease 575195 is attached hereto as Exhibit 2.

17.     On or about April 20, 2022, Wells Fargo and PIA entered into a Lease Agreement ("Lease 779168").  Under Lease 779168, Wells Fargo agreed, for the benefit of WEST, to lease to PIA a CFM56-5B engine bearing engine serial number 779168 ("Engine 779168").  A true and correct copy of Lease 779168 is attached hereto as Exhibit 3.

---

[1]  For legal liability and deal structuring purposes, aircraft assets are often placed in grantor trusts, whereby an "owner trustee" holds legal title to the asset for the benefit of a trust beneficiary.  The owner trustee then leases the asset to an airline operator for the benefit of the beneficiary.  In the transactions at issue here, Bank of Utah and Wells Fargo are the owner trustees; WEST is the beneficiary; and PIA is the lessee.

18.     On or about April 20, 2022, Bank of Utah and PIA entered into a Lease Agreement ("Lease 697262").  Under Lease 697262, Bank of Utah agreed, for the benefit of WEST, to lease to PIA a CFM56-5B engine bearing engine serial number 697262 ("Engine 697262") (collectively, with Engines 697519, 575195, and 779168, the "Engines," and individually, each an "Engine").  A true and correct copy of Lease 697262 is attached hereto as Exhibit 4.

19.     Leases 697519, 575195, 779168, and 697262 refer to and incorporate the terms of the International Air Transport Association IATA Document No. 5016-00 Master Short-Term Engine Lease Agreement dated December 1, 2002 (the "Master Agreement").  A true and correct copy of the Master Agreement is attached hereto as Exhibit 5.

20.     The Master Agreement is an industry standard lease form that governs the parties' relationship, except to the extent the terms of the Master Agreement are modified in the Leases, in which case the Leases modifications apply.  Ex. 5 at §§ 2.1.1, 2.1.2.  Each individual lease and the Master Agreement is to be read as a single independent contract.  *Id.* at § 2.1.2.

21.     The terms of Leases 697519, 575195, 779168, and 697262 are substantively identical.  For the purposes of this Complaint, Leases 697519, 575195, 779168, 697262 and the Master Agreement are referred to as the "Leases."

22.     The Commencement Dates and Scheduled Final Dates were defined in the Leases as follows:

        a.     Lease 697519:  May 18, 2021 – April 17, 2022

        b.     Lease 575195:  May 18, 2021 – April 17, 2022

        c.     Lease 779168:  May 17, 2022 – April 16, 2023

        d.     Lease 697262:  May 17, 2022 – April 16, 2023

*See* Exs. 1-4 at Part I, Points 5, 35; Ex. 5 at § 2.4.1, annex 1.

23.    Under the Leases, PIA agreed to multiple payment obligations, including, but not limited to, the obligation to pay (i) rent in the amount of $45,000 USD/month (under Leases 697519 and 575195) and $43,500 USD/month (under Leases 779168 and 697262); and (ii) substantial monthly "Use Fees," as is customary in the industry, to compensate Lessors for maintenance deterioration and other wear and tear.  Exs. 1-4 at Part I, Points 7, 8, 33, Schedule 1; Ex. 5 at §§ 3.1, 3.2.

24.    The initial rent payment was due on the Commencement Date, and all monthly payments thereafter were due on the same day of the month.  Exs. 1-4 at Part I, Point 9; Ex. 5 at § 3.2.

25.    In the event of any late payment, PIA agreed to "pay additional amounts . . . calculated against amounts owing, at the Default Rate.  Such additional amounts shall be payable from the date the relevant payment is due, to the date it is actually paid, on the basis of the actual number of days elapsed, with a 30-day month and a 360-day year assumed."  Ex. 5 at § 3.5.

26.    The Leases defined the Default Rate as "[f]our and one half per cent (4.25%) per annum over LIBOR (as determined by reference to offered rate for deposits in U.S. Dollars for a period of one month on the first day of the applicable month, and published by the British Bankers Association, "LIBOR"), but not to exceed the maximum amount permitted by law."  Exs. 1-4 at Part I, Point 10.

27.    PIA's payment obligations under the Leases are "absolute and unconditional, and not subject to set-off.  They shall not be reduced or otherwise affected by any act, event, defense, contingency or circumstance whatsoever."  Ex. 5 at § 3.6.

28.     PIA owed numerous obligations related to the ongoing maintenance of the Engines during the Lease terms, as well as the condition of the Engines upon return.  Among other things, PIA agreed to:

    a.    "[P]rocure that routine scheduled, condition-monitored, and on-condition line maintenance is performed on the Engine Package, including preventative tests and system checks."

    b.    Ensure that such maintenance is "undertaken at a standard which, in line with accepted industry practices, would be expected to keep the Engine (a) in serviceable and airworthy condition, (b) fully operational, and (c) in as good operating and physical condition as at the time of delivery (save only normal wear and tear from ordinary operation)."

Ex. 5 at § 4.6.1.[2]

29.     PIA also agreed that upon redelivery, the Engines would:

    a.    "be in as good operating and physical condition (save only normal wear and tear from ordinary operation);

    b.    have the same external configuration; and

    c.    contain a complete set of Parts."

Ex. 5 at § 11.2.2.

30.     The parties agreed that in the event PIA did not redeliver the Engines in compliance with the Lease conditions, the Terms would be automatically extended "until the date on which Lessee fully complies."  Ex. 5 at § 11.6.1.

31.     Under the Leases, the definition of "Events of Default" includes, but is not limited to, the following:

    a.    "[F]ailure by [PIA] to make any payment required under th[e] Agreement within five days of the due date" thereof;"

---

[2] "Engine Package" is defined as the Engine and the Engine Documentation for that Engine.  Ex. 5 at Annex 1.

      b.    "[F]ailure by [PIA] to redeliver the Engine Package as required by [Section] 11" of the Master Agreement; and

      c.    "[F]ailure by [PIA] to comply with or perform any other undertaking or obligation under" the Master Agreement.

Ex. 5 at § 14.1(i), (iii), (iv).

32.    The parties agreed that the above-listed Events of Default would be deemed a repudiation of the Leases, entitling the Lessors to, at their option, "accept that repudiation . . . by giving notice to [PIA] terminating this Agreement and/or the leasing of the Engine Package, ('Lease Termination'); and/or take actions seeking performance of this Agreement by Lessee and/or recovery of Lessor's damages and costs caused by the Event of Default ('Enforcement Action') – without prejudice to [Lessors'] other rights under this Agreement and applicable Law, including its rights, as title-holder of each Engine Package, to sell or redeploy any Engine Package and collect income, profits and/or proceeds therefrom."  Ex. 5 at § 14.2.

33.    In the event of a Lease Termination:

      a.    PIA's "rights in respect of the Engine Package shall cease; and

      b.    [PIA] shall promptly pay [Lessors] the Termination Damage Amount."

Ex. 5 at § 14.2.2.

34.    In the event of a Lease Termination or Enforcement Action, the parties agreed, in relevant part, that:

      a.    Lessors "may Take Possession of the Engine Package,[3] and, to the maximum extent permitted by Law, (a) may do so (1) without petitioning, obtaining leave or an order of, or acting under the supervision of, a court or administrative body, and/or (2) whether

---

[3] The Leases define "Take Possession of the Engine Package" to mean "any action by Lessor or its agents or representatives to take physical or constructive possession, control and/or custody of an Engine Package, directly or through judicial or administrative procedures, whether (i) designed to immobilize, preserve or permit redeployment of that Engine Package and/or (ii) taken at Lessee's operational or storage facilities or on property within the public domain."  Ex. 5 at Annex 1.

> or not [PIA] is insolvent or is then subject to insolvency proceedings, and (b) [PIA] waives its right to object thereto;
>
> b.     Lessors "shall be entitled to all expedited and/or interim remedies or judicial remedies, including those that permit [Lessors] to Take Possession of the Engine Package, and, to the maximum extent permitted by Law, [PIA] waives any objection thereto; and
>
> c.     PIA "shall redeliver that Engine Package to the Redelivery Location and [PIA] hereby authorises [Lessors], at the latter's option, to so redeliver on behalf of [PIA]."
>
> d.     PIA would "irrevocably appoint[] Lessor its attorney in fact, agent, and/or representative for purposes of 14.2.3(i)-(iii), permitting Lessor, *inter alia*, to execute documentation in Lessee's name and enter Lessee's facilities."

Ex. 5 at § 14.2.3.

35.     The Leases are governed by New York law and include nonexclusive forum selection clauses, under which the parties consented to jurisdiction in the "Courts of the State of New York and the United States District Court located in the Borough of Manhattan, New York City."  Exs. 1-4 at Part I, Points 29, 30; Ex. 5 at §§ 16.7, 16.8.

36.     PIA agreed to waive any rights to "jurisdictional or enforcement immunity (based on theories of sovereign immunity or otherwise), with respect to its obligations under [the Leases] and the documents and transactions contemplated" thereby.  Ex. 5 at § 15.1(vi); *see also id.* at § 16.8.1(ii) (the parties waive "any right to assert sovereign immunity with respect to jurisdiction or enforcement").

37.     Lessors delivered, and PIA accepted, the Engines, pursuant to the terms of the Leases.

38.     All conditions precedent to Lessee's performance under the Leases have been satisfied.

II.    **The Servicing Agreement**

39.    On March 3, 2020, WEST entered into a servicing agreement (the "Servicing Agreement") with WLFC.  A true and correct copy of the Servicing Agreement is attached hereto as Exhibit 6.

40.    Under the Servicing Agreement, WEST, as beneficial owner of the Engines, appointed WLFC as the exclusive provider of services relating to the Engines, among other assets (Ex. 6 at § 2.01(a)) and authorized WLFC to provide services in connection with the Leases, including but not limited to taking "reasonable steps to enforce the rights and remedies" of Lessors under the Leases and "pursuing such legal action with respect thereto as [WLFC] deems reasonably necessary or appropriate."  Ex. 6 at § 1.06 of Schedule 2.02(a).

III.    **The Cape Town Convention**

41.    The Consolidated Text of the Convention on International Interests in Mobile Equipment (the "Convention") and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment (Cape Town on 16 November 2001) (the "Protocol") (collectively with the Convention, the "CTC") is an international treaty intended to standardize, among other things, transactions involving movable property, including "aircraft objects."[4]

42.    Under Article 13 in Chapter III of the CTC, "a creditor who adduces evidence of default by the debtor may, pending final determination of its claim and to the extent that the debtor has at any time so agreed, obtain from a court speedy relief in the form of such one or more of the following orders as the creditor requests:

a.    Preservation of the object and its value;

---

[4] "Aircraft objects" are defined under the Protocol to include whole aircraft as well as spare aircraft engines. Protocol at Chapter I, (c).

   b.  Possession, control or custody of the object;

   c.  Immobilization of the object; and

   d.  Lease or, except where covered by sub-paragraphs (a) to (c), management of the object and the income therefrom."

43. Article 11(2) of the CTC defines "default" as "a default which substantially deprives the creditor of what it is entitled to expect under the agreement."

44. Article IX of the Protocol provides that in "addition to the remedies specified in Chapter III of the Convention, the creditor may, to the extent that the debtor has at any time so agreed and in the circumstances specified in that Chapter:

   a.  Procure the de-registration of an aircraft; and

   b.  Procure the export and physical transfer of the aircraft object from the territory in which it is situated."

45. Under the Leases, the parties agreed that in an Event of Default, Lessors were entitled to "Take Possession of the Engine Package, and, to the maximum extent permitted by Law, (a) may do so (1) without petitioning, obtaining leave or an order of, or acting under the supervision of, a court or administrative body, and/or (2) whether or not Lessee is insolvent or is then subject to insolvency proceedings, and (b) [PIA] waives its right to object thereto."  Ex. 5 at § 14.2.3(i).

## IV. PIA's Breaches

46. Starting on or about late June 2022, PIA began defaulting on its payment obligations under the Leases.

47. Lessors promptly notified PIA that an Event of Default had occurred.

48. Over the next several months, in an effort to avoid the need for litigation, WLFC, as servicer, engaged PIA in commercial negotiations regarding PIA's payment defaults.

11

49.     Notwithstanding WLFC's efforts to reach a commercial resolution, PIA failed to cure its payment defaults.

50.     Accordingly, on November 15, 2022, WLFC notified PIA that its failure to pay amounts owing under the Leases constituted a continuing Event of Default and demanded immediate payment of all overdue amounts (the "First Default Notice").  *See infra*, Ex. 7.

51.     WLFC further informed PIA that if PIA failed to cure its default, PIA was obligated to cease operating the Engines and prepare for their prompt return in accordance with the conditions set forth in the Leases.

52.     PIA did not respond to the First Default Notice, make payment, or cease operating the Engines.

53.     On November 22, 2022, WLFC, via its counsel, sent a second notice of default, reiterating its demand that payment be made immediately and in no case later than November 25, 2022 (the "Second Default Notice"), failing which PIA was obligated to return the Engines. WLFC also informed PIA that if PIA did not comply, WLFC intended to take legal action on behalf of the Lessors, including but not limited to requesting injunctive relief.  A true and correct copy of the Second Default Notice is attached hereto as Exhibit 7.

54.     PIA did not respond to the Second Default Notice, make payment, or cease operating the Engines.

55.     On February 3, 2023, WLFC sent a Notice of Continuing Events of Default, again demanding immediate payment of the overdue amounts – which by this date totaled $1,367,570.61 – plus interest, failing which PIA was obligated to return the Engines (the "Third Default Notice").  A true and correct copy of the Third Default Notice is attached hereto as Exhibit 8.

56.     PIA did not respond to the Third Default Notice, make payment, or cease operating the Engines.

57.     On April 6, 2023, WLFC, via its counsel, sent a fourth notice of default demanding payment of the overdue amounts.  By this date, the overdue amount totaled $1,761,426.72, plus interest (the "Fourth Default Notice").  A true and correct copy of the Fourth Default Notice is attached hereto as Exhibit 9.

58.     Once again, PIA did not respond to the Fourth Default Notice.  Nor did PIA make payment or cease operating the Engines.

59.     On April 19, 2023, WLFC, via its counsel, sent a fifth notice of default (the "Fifth Default Notice").  A true and correct copy of the Fifth Default Notice is attached hereto as Exhibit 10.

60.     PIA did not respond to the Fifth Default Notice, make payment, or cease operating the Engines.

61.     PIA's failure to respond to not one, but to *six* default notices, is inexcusable.

62.     Upon information and belief, PIA did not comply with its maintenance obligations during the Lease terms, causing them to deteriorate in value.

63.     On January 17, 2023 date, PIA returned Engine 575195 to Bridgend, Wales, UK.

64.     On June 1, 2023, PIA returned Engine 697519 to Cardiff Airport, Wales, UK.

65.     Engine 575195 did not comply with the return conditions and other requirements of the Leases.  Upon information and belief, Engine 697519 also did not comply; nor will the other two engines.

66.    Engines 697262 and 779168 have not been returned to Lessors and remain on wing and flying in Pakistan.   Upon information and belief, PIA continues to operate Engines 697262 and 779168, and their condition is thus continuing to deteriorate.

67.    Because Engines 575195 and 697519 did not comply with the Leases' return conditions, and because Engines 697262 and 779168 have not been returned, the Lease Terms have been automatically extended and PIA's payment obligations are ongoing.

68.    As a result of PIA's failure to fulfill its payment obligations under the Leases, honor its maintenance obligations, and return the Engines in compliance with the return conditions, Plaintiffs have suffered millions of dollars in direct damages.

69.    The overdue amount attributable to the payment obligations under the Leases is $1,790,687.28.

70.    Plaintiffs have also suffered consequential and incidental damages as a direct result of PIA's breaches, including but not limited to lost rental income, costs and expenses incurred in attempting to recover possession of the Engines, and lost revenue due to Lessors' inability to re-lease the Engines to a third party.

## FIRST CLAIM FOR RELIEF (BY BANK OF UTAH, WEST, AND WLFC)
### (Breach of Payment Obligations under Lease 697519)

71.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 70 as part of this Count.

72.    Lease 697519 constitutes a binding and enforceable contract by and between Bank of Utah, on the one hand, and PIA, on the other hand.

73.    Bank of Utah has performed and discharged all of its obligations under Lease 697519.

74.     PIA has breached Lease 697519 by, *inter alia*, failing to fulfill its payment obligations.

75.     As a direct result of PIA's breaches, Bank of Utah, WEST, and WLFC have incurred damages, for which the total aggregated amount under the Leases is $1,790,687.28

### SECOND CLAIM FOR RELIEF (BY BANK OF UTAH, WEST, AND WLFC)
### (Breach of Payment Obligations under Lease 575195)

76.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 75 as part of this Count.

77.     Lease 575195 constitutes a binding and enforceable contract by and between Bank of Utah, on the one hand, and PIA, on the other hand.

78.     Bank of Utah has performed and discharged all of its obligations under Lease 575195.

79.     PIA has breached Lease 575195 by, *inter alia*, failing to fulfill its payment obligations.

80.     As a direct result of PIA's breaches, Bank of Utah, WEST, and WLFC have incurred damages, for which the total aggregated amount under the Leases is $1,790,687.28

### THIRD CLAIM FOR RELIEF (BY BANK OF UTAH, WEST, AND WLFC)
### (Breach of Payment Obligations under Lease 697262)

81.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 80 as part of this Count.

82.     Lease 697262 constitutes a binding and enforceable contract by and between Bank of Utah, on the one hand, and PIA, on the other hand.

83.     Bank of Utah has performed and discharged all of its obligations under Lease 697262.

84.    PIA has breached Lease 697262 by, *inter alia*, failing to fulfill its payment obligations.

85.    As a direct result of PIA's breaches, Bank of Utah, WEST, and WLFC have incurred damages, for which the total aggregated amount under the Leases is $1,790,687.28

### FOURTH CLAIM FOR RELIEF (BY WELLS FARGO, WEST, AND WLFC)
### (Breach of Payment Obligations under Lease 779168)

86.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 85 as part of this Count.

87.    Lease 779168 constitutes a binding and enforceable contract by and between Wells Fargo, on the one hand, and PIA, on the other hand.

88.    Wells Fargo has performed and discharged all of its obligations under Lease 779168.

89.    PIA has breached Lease 779168 by, *inter alia*, failing to fulfill its payment obligations.

90.    As a direct result of PIA's breaches, Wells Fargo, WEST, and WLFC have incurred damages, for which the total aggregated amount under the Leases is $1,790,687.28

### FIFTH CLAIM FOR RELIEF (BY BANK OF UTAH, WEST, AND WLFC)
### (Breach of Maintenance and Redelivery Obligations under Lease 697519)

91.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 90 as part of this Count.

92.    Lease 697519 constitutes a binding and enforceable contract by and between Bank of Utah, on the one hand, and PIA, on the other hand.

93.    Bank of Utah has performed and discharged all of its obligations under Lease 697519.

94.     PIA has breached Lease 697519 by, *inter alia*, failing to comply with its maintenance obligations and return Engine 697519 in compliance with the return conditions.

95.     As a direct result of PIA's breaches, Bank of Utah, WEST, and WLFC have incurred damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF (BY BANK OF UTAH, WEST, AND WLFC) (Breach of Maintenance and Redelivery Obligations under Lease 575195)

96.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 95 as part of this Count.

97.     Lease 575195 constitutes a binding and enforceable contract by and between Bank of Utah, on the one hand, and PIA, on the other hand.

98.     Bank of Utah has performed and discharged all of its obligations under Lease 575195.

99.     PIA has breached Lease 575195 by, *inter alia*, failing to comply with its maintenance obligations and return Engine 575195 in compliance with the return conditions.

100.    As a direct result of PIA's breaches, Bank of Utah, WEST, and WLFC have incurred damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF (BY BANK OF UTAH, WEST, AND WLFC) (Breach of Maintenance and Redelivery Obligations under Lease 697262)

101.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 100 as part of this Count.

102.    Lease 697262 constitutes a binding and enforceable contract by and between Bank of Utah, on the one hand, and PIA, on the other hand.

103.    Bank of Utah has performed and discharged all of its obligations under Lease 697262.

104.    PIA has breached Lease 697262 by, *inter alia*, failing to comply with its maintenance obligations and return Engine Lease 697262 in compliance with the return conditions.

105.    As a direct result of PIA's breaches, Bank of Utah, WEST, and WLFC have incurred damages in an amount to be determined at trial.

### EIGHTH CLAIM FOR RELIEF (BY WELLS FARGO, WEST, AND WLFC)
### (Breach of Maintenance and Redelivery Obligations under Lease 779168)

106.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 105 as part of this Count.

107.    Lease 779168 constitutes a binding and enforceable contract by and between Wells Fargo, on the one hand, and PIA, on the other hand.

108.    Wells Fargo has performed and discharged all of its obligations under Lease 779168.

109.    PIA has breached Lease 779168 by, *inter alia*, failing to comply with its maintenance obligations and return Engine 779168 in compliance with the return conditions.

110.    As a direct result of PIA's breaches, Wells Fargo, WEST, and WLFC have incurred damages in an amount to be determined at trial.

### NINTH CLAIM FOR RELIEF (BY PLAINTIFFS)
### (Return of Aircraft)

111.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 110 as part of this Count.

112.    Under Article 3 of the Convention and Article IX of the Protocol, a lessor that shows a lessee is in default under a lease is entitled to an order granting immediate possession or control of the leased object.

113.    Under Section 14.2.3(i) of the Master Agreement, PIA agreed that if an Event of Default occurred, Lessors would be entitled to take possession of the Engines to the maximum extent permitted by law, and waived its right to object to any repossession.

114.    PIA is in default under the Leases.

115.    Plaintiffs are thus entitled to an order of immediate possession of the Engines.

**<u>DEMAND FOR RELIEF</u>**

WHEREFORE, Plaintiffs request the following relief:

(i)    Money damages for payment defaults under the Leases in the amount of , $1,790,687.28;

(ii)    Money damages for breaches of maintenance and return obligations in an amount to be determined at trial;

(iii)    An Order granting immediate possession of the Engines to Lessors;

(iv)    Prejudgment interest;

(v)    Attorneys' fees, costs and expenses; and

(vi)    Such other relief as the Court deems just and appropriate.

Dated: June 8, 2023
New York, New York

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP
Anne C. Lefever
Spencer E. Young
31 West 52 Street
New York, New York 10019
Phone:  (212) 858-1000
Fax:  (212) 858-1500
anne.lefever@pillsburylaw.com
spencer.young@pillsburylaw.com

19